## CHAMPAIGN COUNTY, ILLINOIS, Petitioner,

v.

## UNITED STATES LAW ENFORCEMENT ASSISTANCE ADMINISTRATION, Respondent.

No. 78–2622.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1979.

Decided Dec. 28, 1979.

Arthur M. Lerner, Champaign, Ill., Joseph Pavia, Asst. State's Atty., Urbana, Ill., for petitioner.

Freddi Lipstein, Civ. Div., Dept. of Justice, Washington, D. C., for respondent.

Before FAIRCHILD, Chief Judge, and TONE and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff-appellant, Champaign County, Illinois (the County), seeks review of a decision by the Administrator of the Law Enforcement Assistance Administration (LEAA) rejecting its application for construction funds pursuant to Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 as amended, 42 U.S.C. §§ 3701–3796c (1976). The LEAA found that the County had failed to comply with the matching funds requirements of the LEAA regulations, LEAA Guideline M 4500.1E, App. 1, ¶ 4, at 2–3 (1976), and thus, the LEAA denied the Part E discretionary grants that the LEAA had earmarked for the County. We affirm.

## I.

In 1976 Champaign County resolved to construct a new county courthouse and jail. On September 23, 1976 the County applied to the LEAA for financial assistance seeking a discretionary grant of $7.7 million. On November 18, 1976 Richard Velde, the LEAA Administrator, wrote to the congressman for Champaign County, Edward Madigan, and indicated that he had "directed that up to $700,000 in LEAA Part E (Corrections) discretionary funds be made available for the jail portion of this project" subject to further processing of the application. He further wrote that the staff of LEAA's regional office would contact the county officials to complete the processing of the grant. On November 29, 1976 the regional office of LEAA wrote the County and indicated that the County must "submit a revised application for an amount not to exceed $700,000." It is undisputed that the County never filed a revised application.

On January 10, 1977 officials of the County and Congressman Madigan met with LEAA Administrator Velde. At this meeting Velde indicated that he would reserve an additional $700,000 in Part E discretionary funds for the County. Velde indicated that the LEAA would contact County officials shortly thereafter to finish processing the grant. On January 21, 1977 the Regional Administrator for LEAA wrote the County confirming that there were now $1.4 million Part E discretionary funds available. The Regional Administrator stated that a letter of intent was necessary. On February 2, 1977 the County sent a letter of intent to the LEAA. The letter of intent included a proposed funding strategy, and explained that because the $1.4 million commitment was substantially less than the $7.7 million originally requested the County had decided to proceed only with the jail; the courthouse would be held in abeyance.

The County held a referendum in April 1977 to raise $5 million for construction of the jail. This referendum was defeated. In May of 1977 the County contacted LEAA and requested a six-month extension of the $1.4 million commitment because of financing difficulties and design changes in the project. On June 17, 1977 the Assistant Administrator, Office of Regional Operations, denied the request for the six-month extension and rejected the grant application. The reason given for the rejection was that the County had been "nonresponsive to LEAA Guidelines so as to preclude implementation. . . ." In a more specific letter dated September 1, 1977, the Assistant Administrator informed the County that the reason for the rejection of the grant was noncompliance with the cash matching provisions of LEAA Guideline M 4500.1E, App. 1, ¶ 4, at 2–3 (1976). The County sought administrative review of this action.

The Administrative Law Judge (ALJ), after a hearing, affirmed the LEAA's action. The ALJ found that the Administrator had committed funds to the County which, despite the failure of LEAA to follow LEAA manual procedures for issuing a formal award, amounted to an award of funds. The ALJ then concluded that the County neither accepted the $1.4 million award nor demanded a hearing to contest the LEAA decision to award less than the $7.7 million originally requested. Because the County chose instead to alter its construction plans, the ALJ found that the LEAA's only obligation was to hold the commitment open for a reasonable period of time. Since the LEAA did this, the June 17, 1977 termination of the award was found to be proper.

The Administrator, to whom the County appealed the ALJ's decision, adopted the ALJ's conclusions of law and findings of fact with certain modifications. The Administrator found that the County had never submitted "a revised application for the amount made available," and the required documentary evidence of an award had never been made. This appeal followed.

## II.

Congress established the Law Enforcement Assistance Administration as part of the Omnibus Crime Control and Safe Streets Act of 1968. Congress established

LEAA out of a determined need that greater resources be devoted to the entire criminal justice system without having the federal government dominate the system. The LEAA was charged with "administering grant programs to States and units of local government to strengthen and improve law enforcement." S.Rep.No.1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2113, 2115.

Congress provided for two kinds of grants to states and local governments: block and discretionary.[1] Block grants are formula grants based on respective populations. An award of a block grant depends on the establishment of a state planning agency which determines that state's needs for improvement of law enforcement and criminal justice. 42 U.S.C. §§ 3732, 3733. The state planning agency submits a comprehensive statewide plan to the LEAA for review and approval. 42 U.S.C. §§ 3723, 3750b. If approved, the block grant is then distributed by the state planning agency to local groups within the state.

Local governmental units, private nonprofit organizations as well as states may apply for discretionary grants. On an individual basis the LEAA reviews these applications and in its discretion may grant funds directly to such entities "according to the criteria and on the terms and conditions the Administration determines consistent with [the Act]." 42 U.S.C. § 3750d(a)(2).

█ 42 U.S.C. § 3738 provides that state planning agency applications for block grants "shall be either approved or disapproved, in whole or in part, by the [LEAA] no later than ninety days after the date of submission [of the application]. If not disapproved . . . within such ninety days of such application, such plan shall be deemed approved . . . ." The ninety-day requirement of § 3738, by its terms, does not apply to discretionary grants. The LEAA, however, issued an Instruction dealing with the administration of discretionary grants which includes a ninety-day requirement. The Instruction, intended "to promote efficiency and better relationships between the LEAA and its applicants," requires the LEAA to take action on an application for discretionary funds within ninety days. LEAA Instruction I 4062.5.[2] Unlike the ninety-day provision of 42 U.S.C. § 3738, the Instruction does not specify a sanction for noncompliance with the ninety-day directive.

The County contends that because the LEAA did not act on its application for discretionary funds within ninety days of its filing that its application was approved as a matter of law.[3] While no sanction is provided for in Instruction I 4062.5 the County claims that the LEAA intended to model its procedure for discretionary grants after § 3738 and thus, noncompliance means the application must be deemed approved. We disagree that noncompliance with the Instruction has this effect.

Nothing in Instruction I 4062.5 suggests noncompliance with the ninety-day rule means the grant request is deemed approved. The absence of a sanction for noncompliance with the Instruction suggests to us that the LEAA wanted to stop short of adopting all the particulars of the ninety-day rule for block grants embodied in 42

---

1. 42 U.S.C. § 3750d (1976) provides that 50% of the funds allocated by the LEAA for correctional facilities and programs shall be block grants. The remaining 50% of the funds allocated by the LEAA may be distributed in the discretion of the LEAA.

2. LEAA Instruction I 4062.5 provides in pertinent part:

 3. *DEFINITION.* The 90-day rule is an administrative procedure that requires LEAA Central and Regional Offices to take final action on a formal grant application within 90 calendar days after receipt of the application by LEAA. For purposes of this instruction final action is defined as approval, rejection or withdrawal. Preapplications for federal (LEAA) assistance, concept papers, and letters of intent to file a formal application do not meet the definition of a formal application and are not subject to the 90-day rule.

3. The County contends that there are two periods in which the ninety-day rule should apply in this case: one, ninety days from the filing of its application (September 23, 1976), and the other from the date of the filing of its requested letter of intent (February 2, 1977).

U.S.C. § 3738. We also find the absence of a sanction for noncompliance consistent with the congressional provision that these grants are to be made within the agency's discretion. To require the LEAA to disburse funds when it has not acted within ninety days would limit the discretion Congress intended the LEAA to have. The ninety-day rule is only a directive to the LEAA, from the LEAA, to process the applications in a timely fashion. It in no way binds the LEAA when the LEAA fails to do so.[4]

### III.

█ The County next claims that the LEAA in fact awarded a grant. The County argues that because the grant was made and never withdrawn pursuant to LEAA guidelines that the County is entitled to $1.4 million of LEAA discretionary funds.

Section 200 of Title 31 of the United States Code provides that

> no amount shall be recorded as an obligation of the Government of the United States unless it is supported by documentary evidence of—
>
> (1) a binding agreement in writing between the parties thereto, including Government agencies, in a manner and form and for a purpose authorized by law . . . ; or
>
> \* \* \* \* \* \*
>
> (5) a grant or subsidy payable (i) from appropriations made for payment of or contributions toward, sums required to be paid in specific amounts fixed by law or in accord with formulae prescribed by law, or (ii) pursuant to agreement authorized by, or plans

approved in accord with and authorized by, law . . . .

LEAA Guideline M 7100.1A—Chg. 2, ch. 5, ¶ 1a., at 1 (1974)[5], which details the LEAA procedure for complying with § 200, provides that a formal grant award statement which evidences approval by the LEAA must be issued. The LEAA Guideline directs that this "award statement will incorporate by reference or attachment the grant application to which it relates. When issued and accepted by the grantee, it will constitute the operative document obligating and reserving Federal funds. . . ." *Id.* The Guideline goes on to indicate that to accept, the grantee must return a signed copy of the award statement to the LEAA. *Id.* ¶ 1b.

A review of the record indicates that there is no documentary evidence of an agreement between LEAA and the County, entitling the County to the funds. The record shows that on two occasions Administrator Velde informed representatives of the County that he had earmarked funds for the County. On both occasions, however, Velde indicated that the award was contingent on the County complying with further correspondence from the LEAA. At no time, as the County concedes, was a formal award document issued, nor did the County ever accept, in the manner prescribed, what it perceived as an award. Without documentary evidence of an agreement the LEAA did not obligate federal funds to the County. *See* 31 U.S.C. § 200; LEAA Guideline M 7100.1A—Chg. 2, ch. 5, ¶ 1a. & b., at 1.

The County claims that Administrator Velde committed funds orally in a January

---

**4.** The County argues that the ability of the LEAA to suspend operation of the ninety-day rule for a limited period of time suggests that the ninety-day rule was meant to be mandatory. The ability to suspend the ninety-day rule means the LEAA has the option of extending the ninety-day rule and thus suggests the sanction of application approval for noncompliance with the ninety-day rule is less burdensome on the LEAA. However, we find nothing in the suspension provision to suggest that the LEAA intended the sanction of approval to apply to discretionary grant applications.

**5.** In its brief to this court the County asserts that chapter 5 of LEAA Guideline M 7100.1A—Chg. 2 applied only to fiscal 1975. Nothing in chapter 5, however, suggests its application is limited to 1975. Moreover, LEAA Guideline M 4500.1E, App. 3, ¶ 3e., dated September 27, 1976, provides that ¶ 6 of LEAA Guideline M 7100.1A—Chg. 2, ch. 5 does not apply to discretionary grants. By implication, we find that the rest of chapter 5 does apply to grant applications in years subsequent to 1975.

10, 1977 meeting and that this oral commitment and the County's responses to subsequent requests of the LEAA were sufficient documentary evidence of an agreement to obligate funds. To require a formal document and formal acceptance, the County submits, would be to elevate form over substance.[6] We disagree.

The record indicates that in a letter dated November 18, 1976 Administrator Velde wrote Champaign County's Congressman Edward Madigan that "up to $700,000 in LEAA Part E (Corrections) discretionary funds [were] available for the jail portion of [the] project, assuming compliance with pertinent regulations and guideline requirements." He went on to state that LEAA's regional office would contact County officials to finish processing the grant. On November 29, 1976 an officer of LEAA's regional office wrote the County that because the County's application far exceeded the funds made available a revised application must be filed. The County never filed such an application. On January 10, 1977 Administrator Velde met with County officials and indicated that an additional $700,-000 would be made available to the County. Again, the record indicates this was contingent on further contact with the LEAA. The LEAA wrote the County on January 21, 1977 requesting a letter of intent to inform the Washington office of the County's current plans. The County submitted such a letter of intent on February 2, 1977. No further response was received by the County from the LEAA until June 1977 when the LEAA indicated it was denying the County's application.

■ These facts indicate that the LEAA never stated to the County that an award had been made. A reservation of funds does not amount to a formal award especially when, as here, the agency has indicated further correspondence is needed. At no time did the LEAA indicate that the County had completed the application process. The LEAA had requested a new application.[7] The Administrator found and the County concedes, a revised application was never submitted. Further, the County's submission of the requested letter of intent did not, by itself, finalize the agreement. The most the County could reasonably expect was that the Washington office, after being informed of the County's current plans, was in the process of contemplating the making of an award. The LEAA never issued a document indicating that processing of the application had been completed and an award had been made, and the County never requested the issuance of such a document. In short, there was no documentary evidence of an agreement which is necessary to obligate federal funds. No grant had been made.[8]

■ Even though a grant was not made, the LEAA still is required to notify applicants of rejection of grant applications and the reasons for the rejection. 42 U.S.C. § 3758(b) (1976). The LEAA on June 17, 1977 informed the County that its grant application was being rejected because it was "non-responsive to LEAA Guidelines so as to preclude implementation of the specific projects described in the applications.

6. Because we find that there was no evidence of a final agreement, we need not decide whether a formal document conforming to LEAA specifications is required in all situations.

7. The LEAA may properly require special conditions, such as a revised application, as a condition of a grant award. LEAA Guideline M 4500.1E, App. 1, ¶ 6b.

8. The Administrative Law Judge had found that because Administrator Velde had committed LEAA funds, LEAA should be estopped from denying it had made an award. The government may be estopped but the "doctrine of estoppel must be applied with great caution

to the government and its officials." *United States v. Gross*, 451 F.2d 1355, 1358 (7th Cir. 1971). A decision to apply estoppel is a question of law and therefore, properly before this court. *Cf. Graubremse GMBH v. Berg Mfg. & Sales Co.*, 417 F.2d 1201, 1204 (7th Cir. 1969). We do not find that the doctrine should apply on these facts. The County never received word that the processing of its application was complete and it never submitted a revised application which the LEAA had properly requested. On these facts it was unreasonable for the County to rely on an anticipated grant award.

. . ." In response to a request for a more detailed statement of reasons the LEAA, in a letter dated September 1, 1977, stated that the application was rejected for failure to comply with the applicable cash matching requirements. We find that this fulfills the LEAA's obligations under § 3758(b).

 An examination of the record and LEAA requirements for state matching funds reveal that there is substantial evidence to support the LEAA action rejecting the application for this reason and therefore the LEAA determination is conclusive. 42 U.S.C. § 3735(b). An applicant for a Part E discretionary grant must contribute ten percent in hard match funds. A hard match requires an "earmarking in some document associated with the appropriation or budget process, which by state or local government law or practice *binds* the state or local unit of government to use the funds for the purpose of the Act." LEAA Guideline M 7100.1A—Chg. 1, ch. 4, ¶ 20c. (1), at 16 (emphasis added).[9] The LEAA requires a binding commitment of matching funds to guard against a circumstance in which it has awarded federal funds for construction of correctional facilities only to have the promised local funds not be finally allocated.

The County did not satisfy this hard match requirement prior to the rejection of the grant application in June 1977. The County contends that its action at a Febru-

ary 15, 1977 County board meeting should be sufficient to satisfy the LEAA hard match requirement. On February 15, 1977 the County agreed that the necessary funds would be appropriated. This agreement by the County, however, was not binding because, as stated in the minutes to that meeting, it would be necessary to hold public meetings and budget hearings before the funds would be finally committed. This does not satisfy the LEAA hard match requirement that the funds be committed to the stated use by operation of local law, and thus was a proper reason to reject the application.

## IV.

 The County finally claims that the LEAA was without authority to reject the County's application in June 1977. The County contends that since Administrator Velde and the Deputy Administrator had both resigned from office in February 1977, and the President had not appointed anyone to fill these positions as required by 42 U.S.C. § 3711(a) (1976), the LEAA did not have an official who could act as Administrator after March 1977. *See* 5 U.S.C. § 3348 (vacancy in the position at the head of an Executive department caused by a resignation may be filled temporarily but not for a period to exceed thirty days). The County also points out that pursuant to LEAA Guidelines only the Administrator may approve grant applications in excess of

9. The County asserts that this hard match requirement of LEAA Guideline M 7100.1A—Chg. 1, ¶ 4a. and ¶ 20c. by its terms applies only to fiscal year 1974 and thus was improperly applied to deny this application in 1977. 42 U.S.C. § 3750d, amended by Public Law 93–83 in 1973, provides that 10% of any program must be "money appropriated in the aggregate by the State or units of general local government." The legislative history to the 1973 amendment indicates that this change was intended to eliminate the acceptability of "soft" match funding by states or local government units. H.R.Rep. No. 93–249, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 1729, 1732. A hard match consists of cash, while a soft match consists of goods, services, or facilities. The local units must provide their 10% match with cash or hard match funds.

LEAA Guideline M 4500.1E, App. 1, ¶ 4, at 2–3, further explains that applicants for Part E grants must provide 10% of total project costs. This Guideline refers applicants to LEAA Guideline M 7100.1 for further information. LEAA Guideline M 7100.1 indicates some ambiguity concerning the applicability of the matching funds requirement after fiscal 1974. The reference in LEAA Guideline M 4500.1E, App. 1, ¶ 4, should have placed applicants on inquiry concerning action deemed to satisfy the matching funds requirement. Inquiry would have revealed the statutory requirement and that the LEAA has continuously since 1974 required applicants to supply a 10% hard match. Thus, we find that the LEAA could properly reject an application for failure to satisfy the hard match requirement that the funds be committed to the intended use by local law as defined in LEAA Guideline M 7100.1A—Chg. 1, ch. 4, ¶ 20c.

$300,000. LEAA Guideline M 4500.1E, App. 2, ¶ 7i., at 4 (1976). Therefore, the County submits, the LEAA did not have anyone in authority to act on its application.

Here, however, we do not have the approval of a grant application but the rejection of such an application. Nothing in the LEAA Guidelines requires that a *denial* of a grant application in excess of $300,000 be made by the Administrator. In fact, the Administrator had delegated authority to the Assistant Administrator, Office of Regional Operations, "to reject or deny grant applications submitted to LEAA within assigned programs." LEAA Instruction I 1310.19D, ¶ 4d. (1).[10]

It was the Assistant Administrator, Office of Regional Operations, who rejected the County's application. The Assistant Administrator was not acting in the capacity of Acting Administrator when he rejected the application, but as the Assistant Administrator with authority to deny applications delegated to him by the Administrator while the Administrator was still in office. Since a delegation of authority survives the resignation of the person who issued the delegation, *In re Subpoena of Persico*, 522 F.2d 41, 62 (2d Cir. 1975); *United States v. Morton Salt Co.*, 216 F.Supp. 250, 255–56 (D.Minn.1962), *aff'd*, 382 U.S. 44, 86 S.Ct. 181, 15 L.Ed.2d 36 (1965) (per curiam), the Assistant Administrator was acting properly. We need not reach the County's contention that after March 1977 the LEAA did not have a properly appointed Administrator.

### V.

For the foregoing reasons, the Administrator's decision that the County is not entitled to LEAA funds is affirmed. Each party shall bear its own costs on appeal.

AFFIRMED.

---

**10.** The Administrator had authority to so delegate duties. *See* 42 U.S.C. § 3752 (1976).